**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| NICHOLAS WARD, *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | Case No. 1:20-cv-947 |
| | : | |
| v. | : | Judge Jeffery P. Hopkins |
| | : | |
| HIGHLAND COUNTY SHERIFF'S | : | |
| OFFICE, *et al.*, | : | |
| | : | |
| *Defendants*. | : | |

---

### OPINION AND ORDER

---

Robert Ward ("Robert"), now deceased, was the Ward Family's beloved son and brother. He died tragically on November 18, 2019, as a result of a gunshot wound to the chest, only hours after Highland County sheriff's deputies responded to calls about a disturbance coming from the Ward residence concerning Robert's mental state. Soon after evaluating Robert and departing from the Ward residence without removing him, law enforcement found Robert deceased from a gunshot wound in the front yard of Defendant Marvin Huffman ("Huffman"), one of the Ward's neighbors. Huffman fired the fatal shot after discovering Robert engaging in erratic behavior on the Huffman's property that allegedly made Huffman and his wife fear for their lives.

Robert's estate, his mother, Bobby Ward ("Bobby"), and Robert's father and estate administrator, Nicholas Ward ("Nicholas") (collectively, "the Wards" or "Plaintiffs") bring this civil rights and wrongful death action stemming from the events that occurred on the day of Robert's death. In the Complaint, the Wards assert claims against Huffman and the

Highland County Sheriff's Office ("HCSO") including,[1] Deputy Sergeant Craig Seaman ("Seaman"), Deputy Michael Gaines ("Gaines"), and Sheriff Donald Barrera ("Barrera") (collectively, the "Highland County Defendants"). Huffman and the Highland County Defendants have separately moved for summary judgment on the claims asserted against them. Docs. 29, 47. The Wards oppose both motions. Docs. 36, 50. These motions are fully briefed and ripe for review.

For the reasons explained below, Huffman's Motion for Summary Judgment (Doc. 29) is **GRANTED**, and the Highland County Defendants' Motion for Summary Judgment (Doc. 47) is also **GRANTED**. The Wards' Complaint is **DISMISSED** with prejudice.

## I. BACKGROUND

### A. The Facts

#### 1. The Ward Residence

In the early hours of November 18, 2019, Robert began acting in a manner that concerned his mother, Bobby, and brother, Chris. Bobby Dep., Doc. 44, 22:18–23:15. On the morning of his death, Robert startled his mom, Bobby, awake, talking about events that did not happen, and according to her, "acting crazy out of his head," and not making any sense. *Id.* Bobby, motivated by concern for her son, called 911 at 7:27 a.m. *Id.* at 27:15–23. Before speaking to dispatch, however, Bobby hung up because she did not want Robert to know that she had called. *Id.* at 23:19–25:2; 27:22–28:23. Bobby concedes that she was scared of Robert. She also recalled a prior incident where Robert had pushed her and broke a table. *Id.* at 23:19–24; 28:23. However, in the face of Robert's erratic behavior, Bobby called 911 once more

---

[1]   The Wards mistakenly refer to this Defendant as the Highland County Sheriff's Department.

before again hanging up. *Id.* at 25:3–7; 28:2–3. When dispatch called back to inquire about the hang ups, Bobby tried to disguise the identity of the caller because she feared what Robert's reaction might be. She recalled telling dispatch, "I don't need none. Thank you," all the while hoping that dispatch could hear Robert's ramblings and his agitation. *Id.* at 24:6–11; 28:11–23. Several minutes later, Robert's brother, Chris, placed another call to 911. Like his mother, Chris also believed Robert "was not in the right state of mind and [was] making no sense." Chris Dep., Doc. 45, 11:22–12:1. Unlike his mother, however, Chris told dispatch directly that Robert "was out of his head" and "was losing it," *id.* at 12:9–11, but also confirmed to dispatch that his brother did not have any weapons. *Id.* at 12:22–23.

As a result of the emergency calls being placed, Deputy Sergeant Seaman and then-Deputy Gaines responded to the Ward residence. Doc. 43-4, PageID 487. The deputies well understood at the time of the calls they were responding to "some kind of disturbance." Gaines Dep., Doc. 65, 17:4–6. While en route, the officers learned more information about Robert's behavior including that Robert "had not made any threats or harmed anyone but he was going crazy." Doc. 43-4, PageID 488. When deputies Seaman and Gaines arrived at the scene, they were greeted by Robert's brother, Chris. Seaman Dep., Doc. 64, 13:12–13. Chris explained that Robert was "not acting right." Chris Dep., Doc. 45, 15:3–13. Upon their arrival at the Ward residence, Seaman and Gaines engaged with all three individuals present, Bobby, Chris, and Robert. Seaman Dep., Doc. 64, 13:13–21. Seaman remembered having "a calm conversation," with no yelling or shouting with all three. *Id.* at 14:3–4. Robert's mother, Bobby, however, explained to Seaman that "years ago" Robert had been diagnosed as bipolar, but that he did not take any medication. *Id.* at 20:3–6. She also hinted to Seaman that Robert may have been suffering from a diabetic emergency because Robert had behaved similarly

when he was suffering from a diabetic emergency a year earlier. *Id.* at 20:7–11. During that incident, Chris recounted that Robert "smashed a table" and pushed Bobby down. Chris Dep., Doc. 45, 17:6–10.

Upon learning this information, deputies Seaman and Gaines summoned paramedics to the Ward residence to assess Robert's condition. Seaman Dep., Doc. 64, 20:25–21:1. On arrival, paramedics began to speak with Robert while checking his vitals, blood pressure, pulse, eyes, and then his blood sugar. *Id.* at 21:8–15. During the exam, Robert was able to answer all questions put to him by the paramedics. Chris Dep., Doc. 45, 18:10–12. Finding no reason for emergency transport, paramedics asked Robert whether he would like to be transported to the hospital. Seaman Dep., Doc. 64, 22:3–10. According to Chris, Robert "refused because he said he knew his rights." Chris Dep., Doc. 45, 18:15–18. Robert also rejected an invitation to get into the ambulance and shortly thereafter, the paramedics cleared him and left the Ward residence. *Id.* at 18:19–24. Deputies Seaman and Gaines remained at the Ward residence for a while longer discussing matters with Bobby and Chris. Bobby told the officers she did not want Robert arrested, but instead taken for a 72-hour mental health hold. Bobby Dep., Doc. 44, 37:20–22. Eventually, however, Bobby relented and told deputies Seaman and Gaines that Robert could stay at the Ward residence. Chris Dep., Doc. 45, 20:7–9. Robert subsequently assured the deputies that "there wouldn't be any problems, he'd just go to his room when they left." *Id.* at 19:23–24. Before the officers left the Ward residence, Seaman gave Bobby his card and instructed her to call him if she needed help. Bobby Dep., Doc. 44, 39:12–16. She never called them back. *Id.* at 39:22–23.

About ten minutes after officers left, according to his brother, Chris, Robert also left the Ward residence. Chris Dep., Doc 45, 22:6–10. His family members, Bobby and Chris

assumed that Robert was going to visit a friend because he said he was going to his friend's "clubhouse." Bobby Dep., Doc. 44, 40:19–20. None of the Wards tried to stop Robert from leaving. Chris Dep., Doc 45, 22:14–16. And as Bobby observed, Robert "didn't leave like he was going to get hurt or do anything wrong." Bobby Dep., Doc. 44, 40:21–23. That was the last time Bobby and Chris would see Robert alive.

### 2. The Huffman Residence

It is unknown how Robert came upon Huffman's property or where he may have been prior to arriving there. Though the Ward residence was down the road from Huffman's home, Robert did not know Huffman, and Huffman did not know Robert.

In any event, Huffman was in his kitchen with his wife when he first encountered Robert. Huffman testified that Robert was pacing around in his backyard kicking the ground and "hollering and flailing his arms in the air." Huffman Dep., Doc. 59, 8:1–9:19. A few minutes later, Huffman opened his back door and said: "Can I help you?" *Id.* at 11:23–12:2. Huffman further testified that Robert threw his arms in the air, asking "Can you see them?" *Id.* at 12:7–10. After Huffman looked up and back down, he recalled Robert saying, "I've just been dropped off and I'm here to 'effing' kill you." *Id.* Robert then began closing the 20-yard distance between Huffman and himself at a running pace. *Id.* at 12:3–5; 12:21–23:9. Huffman managed to close and lock his door just before Robert reached him. He testified that Robert "had ahold of the doorknob beating on the door in the back of the house, saying he was going to kill [them]." *Id.* at 13:23–14:2. Huffman witnessed Robert grab the doorknob and hit the back of the house. *Id.* at 14:8–11.

Having no success with the doorknob, Robert proceeded to Huffman's detached garage. Meanwhile, Huffman went to a bedroom to retrieve a shotgun. Huffman Dep., Doc.

5

59, 14:24–15:7. Huffman testified that he retrieved the gun "[t]o have something to protect [himself] and his wife because [they] were scared to death." *Id.* It was at about this time that Huffman also told his wife to call 911. *Id.* at 15:8–20. Huffman then went outside onto his front porch with the shotgun and there, he loaded the gun with three shotgun shells. *Id.* at 16:5–21. When he made it onto the front porch, Huffman heard screaming from the garage and thought Robert was throwing things in there. *Id.* at 17:1–18:14. Huffman's dogs also burst outside and ran to the garage. *Id.* When Robert emerged from the garage, according to Huffman, he was "practically running" at him. *Id.* at 19:1–5. Huffman said, "just leave," but Robert continued advancing towards him and said, "I'm going to effing kill you." *Id.* at 19:21–17. As these events unfolded, Huffman states that he did not have his shotgun pointed at Robert. *Id.* But once Robert made it to within 15 feet of him, Huffman raised the shotgun and said, "Stop. Stop. Stop." *Id.* at 21:14–18. Huffman states that when Robert was about 6 or 7 feet away, he fired the shotgun, striking Robert in the chest. *Id.* Huffman testified that Robert did not fall immediately after being shot and continued to "walk[] in the yard" toward Huffman's driveway before eventually falling down. *Id.* at 23:21–24. Huffman returned inside the house, retrieved the phone and spoke to the 911 operator, and waited for law enforcement to arrive. *Id.* at 22:9–23:13. Robert was still breathing when the deputies arrived but ultimately succumbed to his injuries and was pronounced dead at the Huffman's residence. Doc. 43-3, PageID 484.

Thereafter, an investigation ensued. *See* Doc. 37-2, PageID 441–43. Investigators recovered one spent shot gun shell, along with two other shot shells. *Id.* at PageID 442–43. Investigators assessed the back of Huffman's home. Though the Wards emphasize that no latent fingerprints belonging to Robert were found on the doorknob, investigators observed

6

muddy footprints on the back door and on the ground around the back door. Huffman Ex. E, Doc. 29-5, PageID 158; Doc. 36, PageID 227 (citing Exch. 4). Investigators noted that the partial shoe impression located at the rear of the home had a tread pattern similar to the pattern on the shoes recovered near Robert's body. Doc. 37-2, PageID 442–43.

The coroner's report revealed that "[t]he slightly downward and left-to-right trajectory" of the wound was "consistent with Mr. Huffman's account of being rushed by [Robert]." Huffman Ex. C, Doc. 29-3, PageID 154. Toxicology reports "revealed the presence of 11-carboxy-tetrahydrocannabinol with a level of 33 ng/mL and THC level greater than 40 ng/mL in peripheral blood." *Id.* The coroner observed that although he ruled Robert's death a homicide, it was his opinion "as well as that of [his] investigator Dr. James McKown, and Detective Antinore, that Mr. Huffman behaved in a brave and prudent manner." *Id.* at PageID 155. After reviewing all the information related to the investigation, the Highland County Prosecuting Attorney declined to charge Huffman because, in her legal opinion, "Huffman acted in self-defense and defense of another when he discharged his firearm at [Robert], resulting in his death." Huffman Ex. E, Doc. 29-5, PageID 159.

### B. The Claims

As noted, the Wards bring a series of claims against Huffman and the Highland County Defendants as a result of these unfortunate and tragic events. Against Huffman, the Wards assert two state-law wrongful death claims (Counts II, VI). As to the Highland County Defendants, the Wards assert claims for failure to train under 42 U.S.C. § 1983 (Count I), wrongful death under state law (Count II against all Defendants),[2] disability discrimination

---

[2]  In the Wards' Complaint, they indicate that this claim is brought against all Defendants "except CHP." Compl., Doc. 1, PageID 12. Like the Highland County Defendants, the Court has been unable to discern the identity of "CHP" and will assume that any reference to "CHP" was included in error.

under the Americans with Disabilities Act ("ADA") (Count III), conspiracy to deprive constitutional rights under 42 U.S.C. § 1985 (Count IV), and conspiracy to violate civil rights under 42 U.S.C. § 1986 (Count V).

The Court will separately address these claims as each relates to the respective summary judgment motions filed by Huffman and the Highland County Defendants.

## II.    STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at \*3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is *material* if its resolution affects the outcome of an action, and a dispute is *genuine* if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that demands submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

## III. LAW AND ANALYSIS

### A. Defendant Huffman's Motion for Summary Judgment

In Counts II and VI of the Complaint, the Wards assert two state-law wrongful death claims against Huffman.[3] Compl., Doc. 1, ¶¶ 67–68, 80–89. The Court will consider these claims together because it does not appear that these claims differ substantively.[4]

#### 1. Huffman is entitled to summary judgment on the Wards' wrongful death claims (Counts II, VI).

In Ohio, wrongful death claims are governed by Ohio Revised Code Chapter 2125. *Mercer v. Keane*, 2021-Ohio-1576, ¶ 24 (5th Dist.) ("A wrongful death claim is statutory in nature and does not exist at common law."). These claims "serve to compensate a decedent's beneficiaries for the injuries they suffered as a result of the wrongful death." *Est. of Johnson v. Miller*, No. 2:11-cv-00067, 2011 WL 3793497, at *7 (S.D. Ohio Aug. 25, 2011) (citing *Peters v. Columbus Steel Castings Co.*, 115 Ohio St. 3d 134, 137 (2007)). There are three elements to a

---

[3] Although the Wards use the term "Causes of Action" to refer to the six claims for relief they have asserted in the Complaint, the Court will use the term "Counts" for purposes of discussion and easier understanding.

[4] In Ohio, "a personal representative of the decedent's estate may bring a survival action *for the decedent's own injuries* leading to his or her death as well as a wrongful-death action *for the injuries suffered by the beneficiaries of the decedent* as a result of the death." *Peters v. Columbus Steel Castings Co.*, 115 Ohio St. 3d 134, 137 (2007); O.R.C. § 2305.21. Based on the allegations in the Complaint and the Wards' express reference to the wrongful death statute, § 2125.02, nothing suggests that the Wards intended to bring a survivorship claim, so the Court limits its analysis to wrongful death only. *See e.g.*, Compl., Doc. 1, ¶ 68 (seeking damages under § 2125.02); *see id.* ¶ 89 (seeking monetary damages for the "injuries suffered by the Plaintiffs" as opposed to the injuries suffered by Robert).

wrongful death claim brought under Ohio law: "(1) the existence of a duty owed to the plaintiff's decedent; (2) a breach of that duty; [and] (3) proximate causation linking the breach of the duty to the decedent's death." *CBC Eng'rs & Assocs. v. Miller Aviation, LLC*, 880 F. Supp. 2d 883, 888 (S.D. Ohio 2012) (citing *Johnson*, 2011 WL 3793497, at \*7).

Huffman does not contest the elements of a wrongful death claim and instead seeks summary judgment because he allegedly acted in self-defense and in defense of his wife when he shot and killed Robert. Self-defense is an affirmative defense in a tort action. *Goldfuss v. Davidson*, 79 Ohio St. 3d 116, 124 (1997) ("[A] defendant may be relieved of liability for tortious conduct by proving that such conduct was in self-defense."). To prove self-defense, Huffman must show (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of force, and (3) he did not violate any duty to retreat or avoid the danger." *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St. 3d 486, 491–92 (2009) (quoting *State v. Barnes*, 94 Ohio St. 3d 21, 24 (2002)). Under its variant, defense of another, Huffman "stands in the shoes of the person he aids." *State v. Rhodes*, 2025-Ohio-2358, ¶ 14 (2d Dist.) (quoting *State v. Kleekamp*, 2010-Ohio-1906, ¶ 51 (2d Dist.)).

### a. Huffman was not at fault in creating the situation giving rise to the affray.

Huffman asserts there is no evidence he had any role in creating the situation that gave rise to Robert's shooting. In support, Huffman cites *State v. Gillespie*, 2007-Ohio-3439 (2d Dist.). The Ohio appeals court in *Gillespie* explained that the first prong of self-defense "requires a defendant to show that he was not 'at fault' in creating the situation; that is, that he had not engaged in such wrongful conduct toward his assailant that the assailant was provoked to attack the defendant as he did." 2007-Ohio-3439, ¶ 17. Under the facts here, no

10

reasonable jury could find that Huffman engaged in any sort of wrongful conduct that created the situation or provoked Robert's attack on him that eventually led to Robert's death.

Nothing in the record suggests that Huffman had any interactions with Robert before the date of his death, nor that Huffman took any action to cause Robert to come on to his property on November 18, 2019. And no fact suggests that Huffman engaged in wrongful conduct toward Robert such that Huffman might have provoked him in any way. Robert voluntarily entered Huffman's property without Huffman's knowledge or invitation. There is no dispute that Huffman verbally engaged with Robert upon discovering an unknown male, "hollering and flailing his arms in the air" in Huffman's backyard. Huffman Dep., Doc. 59, 8:1–9:19. The record indicates that Huffman only retrieved a shotgun after Robert allegedly said to Huffman that he was there "to 'effing' kill" him. *Id.* at 12:7–10; 13:23–14:2. Though Huffman voluntarily went outside to stand on his porch with his shotgun, there is no evidence that Huffman did anything more or, importantly, provoked Robert in any manner. Instead, Huffman testified that when Robert emerged from the garage, he requested that he "just leave," but Robert continued advancing toward him stating, as he did, "I'm going to effing kill you." *Id.* at 19:21–17. Huffman testified that he did not raise the barrel of the shotgun toward Robert until after Robert allegedly began running at Huffman, closing in on his position, and refusing Huffman's final pleas for Robert to "Stop, Stop, Stop." *Id.* at 21:14–18.

When comparing these facts against those in *Gillespie*, Huffman readily satisfies the first prong of self-defense by showing he was not at fault in creating the situation. By comparison, the *Gillespie* court found that the defendant's conduct did not rise to the level of wrongdoing for purposes of the first prong of self-defense even though the defendant retrieved a shotgun, and then went out looking for the victim, before confronting that individual at the

11

victim's mother's home, and ultimately shooting the victim in the arm. *Gillespie*, 2007-Ohio-3439, ¶ 18. Further, here, the Wards have made no showing that Huffman was in any way at fault in creating the situation giving rise to the affray—he and his wife were minding their own business in their home at the time the trouble began. Because no reasonable jury could find that Huffman was the first aggressor, Huffman has shown there is no genuine dispute of fact on the first prong creating a question for jury consideration. *State v. Turner*, 2007-Ohio-1346, ¶ 24.

> **b. Huffman had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force.**

The second self-defense prong consists of a consideration of a combination of both objective and subjective factors. *Ohio v. Wilson*, 2022-Ohio-3801, ¶ 13 (1st Dist.) (citations omitted). "A defendant's belief that he was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that he faced such danger." *State v. Mitchell*, 2023-Ohio-2604, ¶ 24 (1st Dist.). Importantly, a defendant's ability to claim the privilege of self-defense is limited to the use of "that force which is reasonably necessary to repel the attack." *State v. Williford*, 49 Ohio St.3d 247, 249 (1990)).

In assessing the objective component, courts must consider "the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [he] *reasonably* believed [he] was in imminent danger." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). The undisputed evidence in the record, here, demonstrates that Huffman had an objectively reasonable belief that he was in immediate danger of death or great bodily harm. In an effort to thwart the claim of self-defense, the Wards stress that Robert was

unarmed when he was shot, and thus Huffman's belief was not objectively reasonable. Doc. 26, Page ID 226. This, however, ignores all the other extenuating circumstances leading up to Huffman's decision to discharge the firearm. The record reveals that Huffman, who at the time was 57 years-old and at home with his wife, discovered Robert, an individual nearly half his age, on his property and who was acting in what can only be described as a strange and erratic manner. Huffman Aff., Doc. 29-1, ¶ 3. Huffman did not know Robert, nor where he came from. When Huffman attempted to talk to him, the only conversation Huffman heard Robert say was that he was there to kill him, before running at Huffman and kicking at his back door which Huffman only narrowly escaped by closing and locking the door. Huffman Dep., Doc. 59, 13:22–14:11; 26:5–17. It was this last encounter, according to Huffman, that prompted him to retrieve his shotgun. Huffman testified that he did not immediately shoot Robert, or even raise the barrel of the shotgun toward Robert. Huffman further testified that he raised the gun only after Robert began to advance toward him at a quickened pace, upon emerging from Huffman's garage, where Huffman stored tools, any number of which could have been used as a weapon. Huffman Aff., Doc. 29-1, ¶ 4. Amid this rapidly evolving situation, Huffman "could not see if [Robert] was holding a weapon or something which could be used as a weapon because of where he was holding his hands." *Id.* ¶ 5. Huffman fired a single shot after Robert ignored Huffman's pleas for him to stop and continued to advance toward him, repeating the threats about killing Huffman. Huffman Dep., Doc. 59, 19:21–17; 21:14–18. Under the totality of circumstances, it stands to reason that an individual like Huffman, thrust into the same situation, could have reasonably believed he was in imminent danger.

13

That brings the Court to the subjective component, which requires assessing whether Huffman had an honest belief that he was in imminent danger. In this regard, the Wards question the sincerity of Huffman's claim that he felt any sense of imminent danger. From the Wards' perspective mere verbal harassment is not enough to provoke a person to defend themselves, especially using deadly force. Doc. 36, PageID 225. Though "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations," *State v. Shane*, 63 Ohio St.3d 630, 634–35 (1992), Huffman's testimony shows that his reaction was inspired by far more than just words. Huffman testified that he saw Robert, a stranger, pacing in his backyard kicking the ground and "hollering and flailing his arms in the air." Huffman Dep., Doc. 59, 8:1–9:19. When he first tried to speak with Robert, Robert threw his arms in the air, asking, nonsensically, "Can you see them?" *Id*. at 11:23–12:2; 12:7–10. Moments after the encounter began, Huffman found himself being rushed by Robert escaping, only narrowly by closing and locking the back door, before Robert grabbed the doorknob and began beating and kicking the door, and threatening to kill Huffman and his wife. *Id.* at 13:22–14:11; 26:5–17. Though the Wards make much of the fact that no latent fingerprints belonging to Robert were found on the doorknob, law enforcement later observed muddy footprints on the back door and on the ground around the back door. Huffman Ex. E, Doc. 29-5, PageID 158; Doc. 36, PageID 227 (citing Exch. 4).[5] Consistent with Huffman's account, one footprint that investigators found at the rear of the home had a tread pattern similar to the tread pattern on the shoes discovered next to Robert's body. Doc. 69, PageID

---

[5]    The Court has been unable to identify the documents to which the Wards refer to as "Exch." For example, the Wards refer to "Exch. 4" when discussing the lack of fingerprints on the backdoor. Exhibit 4 to the Wards' response in opposition, however, appears to be the deposition of Gaines. In that deposition, there is no mention of fingerprints in any context. There is, however, a separately filed document that contains the information to which the Wards seem to refer, though it is not labeled as Exch. 4. *See* Doc. 69, PageID 1237.

14

1238. Nothing in the record contradicts Huffman's account that he only ran to grab his shotgun because he and his wife "were scared to death" because of Robert's threatening language and erratic behavior. Huffman Dep., Doc. 59, 14:24–15:4. Nor is there proof to refute Huffman's honest belief that he was in imminent danger which was compounded by his physical condition. At the time of the encounter with Robert, Huffman was 57 years-old and receiving social security disability. Huffman Aff., Doc. 29-1, ¶ 3. Further, due to certain medical and physical conditions, Huffman states that he was unable to move quickly and had trouble breathing at times. *Id.*

Turn then to the moments before Huffman discharged his shotgun. Huffman saw Robert emerge from the garage, where Huffman "kept multiple skinning knives, short pieces of rebar and hand tools," and start toward him at a running pace. Huffman Dep., Doc. 59, 19:1–5; Huffman Aff., Doc. 29-1, ¶ 4. Huffman "could not see if he was holding a weapon or something which could be used as a weapon because of where he was holding his hands." Huffman Aff., Doc. 29-1, ¶ 5. Though he asked Robert to leave, Robert continued to advance toward Huffman's position, repeating the language, "I'm going to effing kill you." Huffman Dep., Doc. 59, 19:21–17. With the distance between them closing, Huffman raised the shotgun and said, "Stop. Stop. Stop," and fired once after Robert did not stop. *Id.* at 21:14–18.

As for this prong, the Wards ask the Court to disbelieve Huffman's statements. That is difficult to do when considering how Bobby and Chris, both of whom made the initial 911 calls, characterized Robert's behavior earlier that same day. According to both Bobby and Chris, Robert was talking about things that did not happen. Bobby Dep., Doc. 44, 22:22–23:9; Chris Dep., Doc. 45, 9:21–10:2. Bobby said Robert "was acting crazy out of his head" and

15

was making "no sense." Bobby Dep., Doc. 44, 23:13–14. And Chris said Robert "was not in the right state of mind." Chris Dep., Doc. 45, 10:4–5. Robert's mother, Bobby, who had on a prior occasion been pushed into table by Robert that broke, was scared. Scared to the extent that she did not want Robert to know she had placed calls to 911 and hoped that dispatch "would hear his ramblings and how loud [] and agitated he was." Bobby Dep., Doc. 44, 24:6–11. To that end, Chris testified that if Robert "would have heard [Bobby make the 911 calls] she would have made [Robert] very mad." Chris Dep, Doc. 45, 10:16–19. Chris then called 911 because Robert was not acting like his brother and was "making no sense." *Id.* at 11:23–12:1. Though they may disagree, the testimony of Bobby and Chris gives credence to Huffman's testimony. Bobby, Chris, and Huffman all observed Robert acting in a manner that was concerning. It is also important to recognize there is no evidence that Huffman knew about Robert's behavior earlier that day. Huffman's account is independent of the accounts of Bobby and Chris, yet they each testified consistently that Robert's behavior had been bizarre on that day.

Even though Bobby, Chris, Seaman, and Gaines all seemed to agree that Robert was not a threat to himself or others while at home that morning, *see* Gaines Dep., Doc. 65, 40:24–41:5; Seaman Dep., Doc. 64, 37:25–38:3; Chris Dep., Doc. 45, 20:18–21:8; Bobby Dep., Doc. 43, 33:1–14, Huffman, a stranger to Robert, encountered Robert at a different location unfamiliar to Robert, after a brief intervening period during which time Robert's whereabouts were unknown. Any of these changed circumstances from earlier that day could have caused an escalation in Robert's behavior. In other words, given that there is no evidence contrary to Huffman's testimony to suggest that Robert was not acting in a threatening manner, the Court cannot find the earlier assessments of Robert's threat level by Bobby, Chris, Seaman, and

Gaines to be enough to create a genuine dispute as to Huffman's bona fide belief that he was in imminent danger of death or great bodily harm.

Though the Wards point to several "discrepancies" to try to discredit Huffman, none are persuasive. First, the Wards take issue with Huffman's claims about Robert's activity in the garage. Huffman testified that Robert "was screaming and throwing things in [his] garage," Huffman Dep., Doc. 59, 17:1–6, but according to the Wards, there is no evidence that anything in the garage was disturbed. Doc. 36, PageID 227. This fact is not material to whether Huffman had a bona fide belief that he was in imminent danger. Huffman testified that he saw Robert enter the garage, where he knew Robert would have access to items that "easily could be used as a weapon," and that Robert exited the garage in a manner that did not show Huffman if Robert was carrying any type of weapon. Furthermore, Huffman was standing on his front porch, and not in a position where he could see inside the garage to know whether anything was disturbed. Huffman Dep., Doc. 59, 17:23–18:2.

Next, the Wards attempt to draw out discrepancies related to Huffman's dogs— seemingly to suggest that Huffman could not have been in imminent danger if they were outside. Huffman testified that his dogs "busted" past him when he opened his door to go onto the front porch. Huffman Dep., Doc. 59, 17:7–10. Huffman also testified that he would usually put his dogs up if a stranger were to come. *Id.* at 32:9–15. None of this really matters, though, because whether Huffman intentionally released his dogs when he opened his front door or if the dogs got outside unintentionally is also immaterial. Huffman testified that he did not see his dogs attack Robert and they eventually disappeared out of his sight into the garage. *Id.* at 18:3–13. No evidence suggests that the dogs emerged from the garage following Robert. In other words, to the extent that the Wards are trying to suggest that the dogs were

17

protecting Huffman, they have offered no evidence that the presence of the dogs had an impact on how Huffman perceived the threat Robert posed when he came from the garage.

Even viewing all the circumstances in the light most favorable to the Wards, the nonmovants, the undisputed evidence shows that Huffman had a bona fide belief that he was in imminent danger of death or great bodily harm. When his verbal pleas did not deter Robert, Huffman raised his shotgun and fired a single shot. *See* Doc. 69, PageID 1238–39. The fact that Huffman fired a single shot, as opposed to multiple, weighs in his favor because typically, "[t]he firing of multiple shots undercuts a claim of self-defense." *State v. McDaniel*, 2006-Ohio-5298, ¶ 15 (10th Dist.) (quoting *State v. Hall*, 2005-Ohio-335, ¶ 40 (10th Dist.), *rev'd on other grounds*, *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313 (2006)). Relevant here, too, is that Huffman discharged his shotgun as Robert was quickly advancing toward him— not away from him. *See, e.g.*, *State v. Collins*, 2020-Ohio-3126, ¶ 42 (10th Dist.) (explaining that "any threat of imminent danger was abated once [the victim] began running away from the house"). Though much of the evidence consists of Huffman's own testimony, Huffman's statements are corroborated by the other evidence of record, such that the Wards have not shown a genuine dispute of material fact on this prong.

### c.  Huffman did not violate any duty to retreat or avoid the danger.

The third and final prong typically involves an assessment of whether the individual asserting self-defense violated any duty to retreat or avoid the danger. Here, however, Huffman contends that he did not violate any duty to retreat due to the applicability of the "castle doctrine." The castle doctrine, in so far as it applies to liability in tort actions, is codified in O.R.C. § 2307.601. The pertinent language reads:

> (B) For purposes of determining the potential liability of a person in a tort action related to the person's use of force alleged to be in self-defense, defense

of another, or defense of the person's residence, if the person lawfully is in that person's residence, the person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence[.]

O.R.C. § 2307.601(B).[6] Though codified separately, near-identical language appears in a different statute, O.R.C. § 2901.09(B), for purposes of applicability to criminal offenses:

(B) For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence[.]

O.R.C. § 2901.09(B). Not surprisingly, the wealth—if not all—of the existing case law on this topic discusses the castle doctrine in the context of the criminal statute. Because courts in civil cases often rely on criminal law for the purpose of assessing self-defense, here it is appropriate to rely on the same for the castle doctrine, especially considering the self-defense standard is the same in both contexts and the material language in both statutes is identical in its effect. *See e.g.*, *Niskanen*, 122 Ohio St.3d at 491–92 (applying *Barnes*, 94 Ohio St.3d at 24). This proves useful when considering the interplay between the castle doctrine and the third prong because in the context of § 2901.09, the statute creates an exception to the third element of self-defense. *State v. Edwards*, 2013-Ohio-239, ¶ 6 (1st Dist.). The only reasonable conclusion therefore is that its civil counterpart, § 2307.601, does the same.

So does the castle doctrine apply to the facts here? Huffman contends that at the time he fired his shotgun, he was standing on the front porch of his home and therefore had no duty to retreat under the castle doctrine. Doc. 29, PageID 138. For purposes of the castle doctrine, a residence is a "dwelling" where a person resides, and a dwelling includes "an

---

[6] This, and the analogous criminal statute, were amended in 2021. Even so, the Supreme Court of Ohio held in *State v. Miree*, 178 Ohio St.3d 216, 220–21 (2024) that "a statute cannot change a duty after the incident occurred," thus the changes to these statutes are prospective, not retroactive. Thus, for purposes of this decision, the statutes in effect as of November 18, 2019, are appropriate to apply here.

attached porch." O.R.C. § 2901.05(D)(2), (3). Huffman testified that he was on his front porch—shown in a photograph to be attached—when he loaded approximately three shells into his shotgun. Huffman Dep., Doc. 59, 16:11–13; Doc. 29, PageID 140. He similarly testified that as Robert began running toward him, just before he discharged his shotgun, Huffman was "backing up on [his] porch." Huffman Dep., Doc. 59, 28:17–22.

In an effort to identify a genuine dispute as to this material fact, the Wards point to a photograph showing where Robert was found in the yard when law enforcement arrived, presumably to suggest that Huffman could not have shot Robert from the porch where Huffman claimed to have been. Doc. 36, PageID 226, 229. In doing so, however, the Wards ignore Huffman's congruent testimony on this point. Huffman testified that Robert did not fall immediately after Huffman shot him and that he—Robert—"walked in the yard" toward Huffman's driveway before ultimately falling to the ground. Huffman Dep., Doc. 59, 23:21–24. Though the Wards say that this claim "is unbelievable to the point of absurdity," they offer no evidence to refute Huffman's testimony. And the Wards fail to acknowledge that Huffman's testimony is congruent with the photograph showing where law enforcement found Robert's body. Doc. 36, PageID 226. Further, the coroner's report revealed that "[t]he slightly downward and left-to-right trajectory" of the wound was "consistent with Mr. Huffman's account of being rushed by [Robert]." Huffman Ex. C, Doc. 29-3, PageID 154. Because the Wards have identified no evidence that demonstrates a genuine dispute in regard to Huffman's position at the time he discharged his shotgun, Huffman was "in" his residence for purposes of § 2901.05(D)(2), (3) and the castle doctrine applies.

Targeting the castle doctrine from a different perspective, the Wards argue that Huffman "could have easily avoided killing [Robert] by remaining inside the safety of his

20

home after he claims he was confronted by [Robert]." Doc. 36, PageID 228. To their credit, Huffman's decision to leave the safety of his home defies common sense. But that does not mean it undermines Huffman's self-defense claim. The castle doctrine relieves individuals of a duty to retreat when they are lawfully in their residence. And whether Huffman was inside the walls of his home or on his attached porch, he was lawfully "in" his residence under § 2901.05(D)(2), (3) and had no duty to retreat or avoid the danger. Now, had Huffman elected to leave his residence and advance toward Robert, then the outcome here may very well be different. *See, e.g.*, *State v. Estelle*, 2021-Ohio-2636, ¶ 24 (3d Dist.) ("Once the defendant cleared the boundaries of his residence, each step the defendant took toward the victim was a step taken in violation of his duty to retreat."); *State v. Angel*, 2021-Ohio-4322, ¶ 58 (10th Dist.) (finding there was sufficient evidence that the defendant violated a duty to retreat based on, *inter alia*, evidence that the defendant fired shots while he was leaving the porch and walking into the yard, autopsy photographs showing an upward wound trajectory, and shell casings recovered in the middle of the yard). But here, Huffman remained on his attached porch, rather than pursue Robert though he knew Robert to be elsewhere on his property. *See id.* Because no facts show (or even suggest) that Huffman left his residence to pursue Robert, the Court finds that Huffman did not violate any duty to retreat.

In sum, the Wards have failed to adduce evidence that creates a genuine dispute of fact as to Huffman's claim that he acted in self-defense. Huffman is therefore entitled to summary judgment.

**B.  The Highland County Defendants' Motion for Summary Judgment**

There are five claims asserted against the Highland County Defendants: failure to train (Count I), wrongful death (Count II), disability discrimination under the ADA (Count III),

conspiracy to deprive constitutional rights (Count IV), and conspiracy to violate civil rights (Count V). Compl., Doc. 1, ¶¶ 61–79. The Court will address these ad seriatim.

### 1. The Highland County Defendants are entitled to summary judgment on the Wards' failure to train claim (Count I).

In Count I of the Complaint, the Wards assert a claim for failure to train under 42 U.S.C. § 1983 against the Highland County Defendants. The Wards allege that the Highland County Sheriff's Office failed to adequately train and supervise officers in relation to encounters with mentally ill individuals. Compl., Doc. 1, ¶¶ 62–64. The Wards state that this failure to train amounted to deliberate indifference to Robert and was the moving force behind the constitutional deprivations they allege he suffered. *Id.* ¶¶ 65–66.

To begin, the Wards assert Count I against all the Highland County Defendants in their official and individual capacities. But the only theory of liability upon which the Wards proceed is based on a failure to train, which is governed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Compl., Doc. 1, ¶¶ 61–66. *Monell* does not impose liability on individuals, *Phillips v. City of Cincinnati*, No. 1:18-cv-541, 2019 WL 2289277, at *6 (S.D. Ohio May 29, 2019), and instead imposes liability on municipalities when (1) a constitutional violation has occurred, and (2) the alleged violation was the result of some "policy or custom" attributable to the municipality. *Monell*, 436 U.S. at 694; *see also Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). In other words, because "individuals sued in their official capacities stand in the shoes of the entity they represent," this is the equivalent of suing their employer. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008) (quoting *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003)). As a result, a claim against the Highland County Defendants in their individual capacities is improper and must be dismissed. *Phillips*, 2019 WL 2289277, at *6.

22

As to the substance of a *Monell* claim asserted against Highland County, there are four avenues under which a plaintiff may prove the existence of an illegal municipal policy or custom: (1) the existence of an illegal official policy or legislative enactment, (2) ratification by an official with final decision-making authority, (3) the existence of a policy of inadequate training or supervision, or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Thomas v. Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). To succeed under the third avenue, inadequate training or supervision, a plaintiff "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

The Sixth Circuit "has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise." *Ellis*, 455 F.3d at 700. The first "is [a] failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Id.* at 700–01 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). And the second "is where the [municipality] fails to act in response to repeated complaints of constitutional violations by its officers." *Brown*, 172 F.3d at 931. Here, based on the allegations contained in the Complaint, the Wards proceed under the former. Compl., Doc. 1, ¶ 63. This "mode of proof is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Winkler*, 893 F.3d at 903 (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015) (alterations in original)).

23

But all that said, there can be no *Monell* claim absent an underlying constitutional violation. *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023); *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under Monell without an underlying constitutional violation."). As this is a threshold issue, the Court will begin its analysis there.

### a. Constitutional Violation

In assessing a constitutional violation under the facts here, the Court must decide whether the Wards have adequately shown that the Highland County Defendants were deliberately indifferent to Robert's medical needs, specifically when deputies Seaman and Gaines elected to leave Robert at the Ward residence and not take him for a mental health hold as Robert's mother, Bobby, had initially requested.[7] Doc. 50, PageID 755–58; Compl., Doc. 1, ¶ 65. In this regard, the overarching question then is what duty, if any, did the Highland County Defendants owe to Robert when they responded to the Ward residence?

"It is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need." *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). Because, however, "the Fourteenth Amendment imposes on the government an affirmative duty to provide medical care to all those it takes into its custody, regardless of the person's precise legal status," the Supreme Court has delineated two exceptions to this general rule: the custody exception and the state-created danger exception. *Colson v. City of Alcoa*, 37 F.4th 1182, 1187 (6th Cir. 2022) (citing *DeShaney*, 489 U.S. at 199–200). Neither applies here.

---

[7]  It should be noted, however, that Robert's mother, Bobby later broke down and told deputies Seaman and Gaines that Robert could stay at the Ward residence. Chris Dep., Doc. 45, 20:7–9.

24

### i. *Custody exception*

First, the custody exception. Often referred to as the *DeShaney* custody exception, this exception "triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under 'other similar restraint of personal liberty.'" *Jackson*, 429 F.3d at 590 (quoting *DeShaney*, 489 U.S. at 200). "[M]ere exercise of 'control over an environment is alone insufficient,'" to trigger its application, *Pierce v. Springfield Twp.*, 562 F. App'x 431, 436 (6th Cir. 2014) (quoting *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007)), because this exception requires "at a minimum—actual, physical restraint of the [individual] by the police," *Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012).

Here, deputies Seaman and Gaines never placed Robert in custody, triggering the *DeShaney* custody exception. There is no testimony or proof that Robert was ever physically restrained or handcuffed, nor that he was ever removed from the Ward residence or kept from leaving the Ward residence by the deputies. Instead, the record reflects that Seaman and Gaines engaged in open conversation with Robert, Bobby, and Chris inside the Ward residence, and that paramedics interacted with Robert for about ten to fifteen minutes, checking his vitals and encouraging him to go to the hospital for treatment, which Robert refused. Bobby Dep., 30:4–31:15; 33:23–36:21. At no point did any officer or paramedic place Robert under any sort of physical restraint. Applying the custody exception to these facts, Robert was not in custody. *See Cutlip*, 488 F. App'x at 113–14 (finding no custody under *DeShaney* in a case involving a suicidal decedent because police never applied physical force to decedent, nor physically subdued him); *Jackson*, 429 F.3d at 590 (finding no restraint of the decedent's liberty where the decedent was unconscious when moved into an ambulance);

*Pierce*, 562 F. App'x at 437 (finding the decedent was not in custody under *DeShaney* where the decedent, incapacitated by a self-inflicted gunshot wound, was never handcuffed, arrested, restrained, or even touched by the police).

### ii.    *State-created danger exception*

Turn then to the state-created danger exception. "A state is not subject to liability under *DeShaney's* state-created danger exception unless it takes an 'affirmative action that exposed decedent to [a] danger to which [he] was not already exposed.'" *Pierce*, 562 F. App'x at 438 (quoting *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995)). To prove a constitutional violation under the state-created-danger doctrine, a plaintiff must show:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Est. of Smithers v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010) (citing *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006)). This is a demanding standard. *Sargi*, 70 F.3d at 913.

Here, the Wards cannot proceed on a state-created danger theory because the Wards have not offered any facts that show an affirmative act by the Highland County Defendants created or increased the risk that Robert would be shot by Huffman. Rather, they expressly rely on the Highland County Defendants' alleged failure to act. Doc. 50, PageID 758.

But a failure to act does not qualify as an affirmative act. *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). In *Cartwright*, the defendant officers came upon the intoxicated decedent on the side of the road. *Id.* at 489. The officers offered the decedent a ride to a convenience store, where they ultimately left him. *Id.* A few hours later, the decedent was run over by a truck and killed as he laid in the middle of a road about two miles from the

store. *Id.* The Sixth Circuit determined that the plaintiff could not show that the defendant officers created or increased the risk that the decedent would be struck by a vehicle and thus did not commit an affirmative act under the state-created danger theory. *Id.* at 493.

The same is true here. Failing to remove Robert from the Ward residence for a mental health evaluation was not an affirmative act. *See, e.g.*, *Sargi*, 70 F.3d at 912–13 (failing to provide bus drivers with a plan for managing emergencies, failing to maintain communication devices on a bus, and failing to tell the bus driver of the student's medical condition were not affirmative acts in a case where the child suffered fatal heart failure on school bus); *Cheriee Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) (failing to rescue kidnap victim, who died after being abducted, and lying about the case to the victim's family, were not affirmative acts). At the time that deputies Seaman and Gaines were at the Ward residence, neither of them, nor any of Robert's family had reason to believe Robert was a harm to himself or others. Gaines Dep., Doc. 65, 40:24–41:5; Seaman Dep., Doc. 64, 37:25–38:3; Chris Dep., Doc. 45, 20:18–21:8; Bobby Dep., Doc. 43, 33:1–14. Furthermore, the undisputed facts show that the Highland County Defendants played no role in Robert's decisions (1) to voluntarily leave the Ward residence, after Seaman and Gaines had left, (2) to travel to the home of a stranger, Marvin Huffman, and (3) to enter Huffman's property uninvited. As here, "[w]hen a victim bears some responsibility for the risks [he] incurred, it is even more difficult to say that the 'state' has 'created' the 'danger' [] by its affirmative acts." *Reynolds*, 438 F.3d at 694. Thus, the Wards cannot succeed on a state-created danger theory for purposes of proving that a constitutional violation occurred.

All told, "[a]n underlying constitutional violation is the *sine qua non* of municipal liability." *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1099 (6th Cir. 2023) (citing *Monell*, 436 U.S. at

27

694; *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019)). Without a constitutional violation, the Wards have no viable claim under *Monell*. *Thomas*, 854 F.3d at 367 ("No constitutional violation means no municipal liability.")). The Highland County Defendants are therefore entitled to summary judgment on the Wards' claim seeking to impose civil liability for failure to properly train or supervise its officers.[8]

### 2. The Highland County Defendants are entitled to summary judgment on the Wards' wrongful death claim (Count II).

In Count II of the Complaint, the Wards assert a claim for wrongful death against the Highland County Defendants. As stated earlier, there are three elements to a wrongful death claim in Ohio: "(1) the existence of a duty owed to the plaintiff's decedent; (2) a breach of that duty; [and] (3) proximate causation linking the breach of the duty to the decedent's death." *CBC Eng'rs & Assocs*, 880 F. Supp. 2d at 888 (citing *Johnson*, 2011 WL 3793497, at *7). The Highland County Defendants argue in favor of summary judgment on the basis they are entitled to qualified immunity and the Wards cannot demonstrate proximate causation, the third element of a wrongful death claim. Doc. 47, PageID 684–85.

Even assuming, without deciding, that the Wards satisfy the first two elements of a wrongful death claim, the Highland County Defendants are entitled to summary judgment because the Wards have failed to adduce evidence that creates a genuine dispute of material fact as to the third element, proximate causation. Proximate causation may be established "[i]f the injury sustained is the natural and probable consequence" of the breach. *Wilkes v. Ohio Dep't of Trans.*, 2025-Ohio-1030, ¶ 43 (10th Dist.) (citing *Sutowski v. Eli Lilly & Co.*, 82

---

[8] In opposition to the Highland County Defendants' summary judgment motion, the Wards frequently rely on the report of expert Dr. George C. Klein to show that Seaman and Gaines were deliberately indifferent to Decedent's medical needs. *See e.g.*, Doc. 50, PageID 758. Because, however, his opinion is not relevant to the issue of whether a constitutional violation occurred, the Court need not address it.

Ohio St.3d 347, 351 (1998)). An injury is a natural and probable consequence if it appears "that the injury complained of could have been foreseen or reasonably anticipated from" the alleged act. *Strother v. Hutchinson*, 67 Ohio. St.2d 282, 287 (1981) (quotation omitted).

Under the facts here, no reasonable jury could find that Robert's death was a natural and probable consequence of the Highland County Defendants' alleged failure to provide adequate medical care to Robert. The record shows that neither the responding officers, nor Robert's family had reason to believe Robert was a harm to himself or others while he was at the Ward residence. Gaines Dep., Doc. 65, 40:24–41:5; Seaman Dep., Doc. 64, 37:25–38:3; Chris Dep., Doc. 45, 20:18–21:8; Bobby Dep., Doc. 43, 33:1–14. Thus, no one could have foreseen or reasonably anticipated that after deputies Seaman and Gaines left, Robert would leave the Ward residence, travel to the Huffman home, a neighbor and stranger, and act in a manner that would cause Huffman to fear for his life and shoot Robert. *See, e.g., Schoenfield v. Navarre*, 2005-Ohio-6407, ¶ 27 (6th Dist.) ("Although [the decedent's] suicide was very tragic, nothing in the record demonstrates obvious signs of what his intentions were or that the police failed to act appropriately under the circumstances presented."). In fact, Robert's mother, Bobby testified that when Robert told them he was leaving the Ward residence after the deputies had gone, he did not leave "like he was going to get hurt or do anything wrong." Bobby Dep., Doc. 44, 40:21–22. Accordingly, because there is no genuine dispute on the element of proximate causation, the Wards' wrongful death claim fails as a matter of law.

### 3. The Highland County Defendants are entitled to summary judgment on the Wards' ADA claim (Count III).

The Court turns now to Count III, the Wards' ADA claim against the Highland County Defendants. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits

29

of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. There are two types of claims available under Title II: (1) intentional discrimination and (2) failure to make a reasonable accommodation. *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017). Both claims are at issue here.

### a.  Intentional Discrimination

A claim for intentional discrimination under the ADA is analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–08 (1973). Under the *McDonnell Douglas* framework, the Wards must first establish a prima facie case of discrimination. *Anderson v. City of Blue Ash*, 798 F.3d 338, 356–57 (6th Cir. 2015). To do so, the Wards must show (1) that Robert was a person with a disability; (2) that he was otherwise qualified; and (3) that he was excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of his disability. *Id.* at 357 (citing *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008)). The Highland County Defendants do not dispute the Wards' ability to satisfy the first two factors and instead focus on the third factor. In that regard, the Highland County Defendants argue there is "zero evidence" of intentional discrimination, nor any deprivation of services. Doc. 47, PageID 684.

The record does not support the Wards' claim that the Highland County Defendants intentionally discriminated against Robert. To support their claim, the Wards allege that these defendants "failed to investigate the circumstances surrounding their dispatch to the Ward's residence and showed no regard for [Robert]'s disability." Compl., Doc. 1, PageID 13. But that is contradicted by the undisputed facts in the record. Bobby testified that Seaman and Gaines summoned paramedics to the Ward residence to assess Robert. Paramedics assessed Robert for approximately ten to fifteen minutes and took his vitals. Bobby Dep., Doc. 44,

35:8–15. The paramedics recommended to Robert that he go to the hospital for further evaluation, but he refused. In fact, Bobby testified that the paramedics "really did try to get him to go to the hospital and get checked out," but Robert "refused" to do that because "he knew his rights" and that "he didn't have to go." *Id.* at 35:12–18. None of these facts show that Robert was excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of his disability.

But what about Bobby's request that Robert be taken for a mental health evaluation? Bobby testified that she did not want Robert to be arrested, but she requested that officers take Robert for a 72-hour mental health hold.[9] *Id.* at 37:20–22; Chris Dep., Doc. 45, 19:14–20:9. Not transporting him to the hospital for evaluation, the Wards say, amounts to intentional discrimination. Not so. Seaman and Gaines independently observed Robert and had no reason to believe that he was a harm to himself or anyone else. Gaines Dep., Doc. 65, 40:24–41:5; Seaman Dep., Doc. 64, 37:25–38:3. Chris testified that Robert did not have any weapons at the Ward residence, had not threatened anyone at the home with violence, and had said nothing about wanting to harm himself. Chris Dep., Doc. 45, 20:18–21:8. Bobby confirmed that Robert had not threatened any violence toward her or Chris, nor made any comments about wanting to harm himself. Bobby Dep., Doc. 43, 33:1–14. And Chris testified that after going back and forth with one of the officers, Bobby said that Robert could stay at the Ward residence. Chris Dep., Doc. 45, 19:14–20:9. Based on these facts, no reasonable jury could find that Robert was excluded from participation in, denied the benefits of, or subjected to discrimination under the program—let alone because of his disability. *Dillery v. City of*

---

[9]  Chris testified, however, that after going back and forth with at least one of the officers a few times, Bobby said that Decedent could stay. Chris Dep., Doc. 45, 19:14–20:9.

31

*Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005) (rejecting an intentional discrimination claim because the plaintiff could not show that the defendants' actions were "because of her disability"). Because the Wards have not presented "evidence that animus against the protected group was a significant factor in the position taken by [the Highland County Defendants]," *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006), the Wards have failed to state a prima facie case for Title II intentional discrimination.

### b. Failure to Provide Reasonable Accommodation

Turn then to reasonable accommodation. In this regard, "Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 159–60 (2016). Stated differently: "Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004). These obligations apply to "virtually everything a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Whether an accommodation is reasonable is a "highly fact-specific, [] case-by-case inquiry." *Roell*, 870 F.3d at 489 (quoting *Anderson*, 789 F.3d at 356).

Here, the Title II accommodation sought by the Wards is far from reasonable.[10] Consider this: would it be reasonable (or even lawful) for law enforcement to seize an unwilling adult (here, Robert) at his family's request for a mental health evaluation when no individual (here, neither responding officers, nor Robert's family) had reason to believe that

---

[10]   It is unclear whether the text of § 12132 reaches the type of law enforcement conduct at issue. *Booth v. Lazzara*, 164 F.4th 581, 588 (6th Cir. 2026) (declining to resolve the question because the plaintiff had failed to identify a reasonable accommodation as a matter of law). That said, as in *Booth*, this Court "will simply 'assume' that the ADA might regulate this type of law-enforcement conduct." *Id.* (citing *Wilson v. Gregory*, 207 F.3d 795, 801 (6th Cir. 2021) and *Roell*, 870 F.3d at 489).

32

the unwilling adult posed a danger to themselves or others? If one were to consider this question within the context of Fourth Amendment jurisprudence, the answer is clearly no.

The Fourth Amendment "restricts the government's ability to seize individuals for mental-health reasons." *Helms v. Boyd Cnty. Sheriff's Dep't.*, No. 24-5853, 2025 WL 1693827, at *4 (6th Cir. 2025). Thus, to seize individuals for mental health evaluations, "officers must have probable cause that individuals pose a danger to themselves or others." *Id.* (citing *Machan v. Olney*, 958 F.3d 1212, 1214 (6th Cir. 2020)). To be clear, the Wards' do not address their reasonable accommodation claim in this context. But it is a fair consideration when, surely, the bounds of the Fourth Amendment inform the policies, practices, and procedures that the Highland County Defendants are expected to follow when presented with the type of situation that occurred here. Indeed, the policy cited by the Wards indicates in relevant part:

> A deputy of the Highland County Sheriff's Office may take a person into custody and transport them to a general hospital, who has reason to believe that the person is a mentally ill person subject to hospitalization by court order under division (b) of section 5122.01 of the Ohio Revised Code, when that person represents a *substantial risk of physical harm to self or others*.

Pl. Ex. A, Doc. 50-1, PageID 769 (emphasis added). In light of this evidence, the policy of the Highland County Sheriff's Office aligns with the standard applying to seizure of persons under the Fourth Amendment. It would be a contradiction to expect a policy accommodation at odds with an individual's right against unlawful seizure and thus cannot be considered reasonable. *Cf. Booth v. Lazzara*, 164 F.4th 581, 588 (6th Cir. 2026) ("Our cases make clear that an accommodation is not reasonable if it requires more than a 'moderate' change to existing policies.") (citing *Doe by K.M. v. Knox Cnty. Bd. of Ed.*, 56 F.4th 1076, 1087 (6th Cir. 2023)).

The record is clear: neither the responding officers, nor Robert's own family had reason to believe Robert was a harm to himself or others while he was at the Ward residence. Gaines Dep., Doc. 65, 40:24–41:5; Seaman Dep., Doc. 64, 37:25–38:3; Chris Dep., Doc. 45, 20:18–21:8; Bobby Dep., Doc. 43, 33:1–14. Robert, an adult, also declined to go willingly to the hospital at the paramedics' recommendation. As there is no genuine dispute of fact regarding whether the Highland County Defendants intentionally discriminated against Robert or failed to make a reasonable accommodation for his alleged disability, they are entitled to summary judgment on the claims asserted by the Wards under Title II of the ADA.

### 4. The Highland County Defendants are entitled to summary judgment on the Wards' conspiracy claims under 42 U.S.C. §§ 1985, 1986 (Counts IV, V).

In Counts IV and V of the Complaint, the Wards assert claims for conspiracy to deprive constitutional rights and conspiracy to violate civil rights under 42 U.S.C. §§ 1985, 1986 against the Highland County Defendants. Compl., Doc. 1, ¶¶ 72–79. The Highland County Defendants seek summary judgment on the § 1985 claim because they allege that the Wards have not identified the provision that applies to their claim and have failed to plead their claim with specificity. Doc. 47, PageID 680–81. They seek summary judgment on the § 1986 claim because without a viable claim under § 1985, the Wards do not have a cognizable claim under § 1986. *Id.* at PageID 681–82. The Wards have not addressed either claim.

By all accounts, the Wards have abandoned their conspiracy claims as they address neither claim in opposition to summary judgment, nor point to any evidence that would create a factual dispute on either claim. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This [Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). In any event, with or without the Wards, the Court still must decide

whether the Highland County Defendants are entitled to summary judgment because "the party moving for summary judgment must meet his burden of production to prevail, regardless of whether the adverse party responds." *Bruin v. White*, No. 5:16-cv-105, 2021 WL 4303684, at *2 (W.D. Ky. Sept. 21, 2021) (citing *Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017)).

In order to state a claim under § 1985, "a plaintiff must allege '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Webb v. United States*, 789 F.3d 647, 671–72 (6th Cir. 2015) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 518–19 (6th Cir. 2003)). Importantly, a § 1985 claim "must be based upon race or other 'inherent personal characteristics.'" *Id.* (quoting *Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980)).

The Court agrees with the Highland County Defendants that the Wards have not met their burden in regard to the § 1985 claim. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)) ("It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim."). There are no material facts asserted in the Complaint, nor any mention of race or class-based animus. Compl., Doc. 1, ¶¶ 72–76. Furthermore, at summary judgment, the Wards have offered no evidence in support of this claim, nor addressed this claim at all, such that this Court could find a genuine dispute exists as to this claim. The Highland County Defendants are therefore entitled to summary judgment on the § 1985 claim.

35

The Court likewise agrees that the Highland County Defendants are entitled to summary judgment on the analogous § 1986 conspiracy claim because § 1986 "is designed to punish those who aid and abet violations of § 1985." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994) (quoting *Browder v. Tipton*, 630 F.2d at 1155). In other words, without a violation of § 1985, there can be no violation of § 1986.

## IV.    CONCLUSION

Though the facts in a case such as this are "undeniably tragic," *DeShaney*, 489 U.S. at 191, not every tragedy has a remedy at law. The law compels dismissal of all claims. Thus, for the reasons stated, Defendant Huffman's and the Highland County Defendants' Motions for Summary Judgment (Docs. 29, 47) are **GRANTED**. The Court therefore **DISMISSES** the Wards' Complaint (Doc. 1) **WITH PREJUDICE**. The Court **ORDERS** the clerk to **ENTER JUDGMENT** and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

March 31, 2026

Jeffery P. Hopkins
United States District Judge

36